UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DAVID MULINIO D/B/A LAWN-PRO

**COMPLAINT**

          -vs-

**CIVIL CASE NO:** 1:10-CV-1115
(GLS/RFT)

CITY OF TROY, HARRY TUTUNJIAN, individually
and as Mayor of the City of Troy, and DAVID B.
MITCHELL, individually and as Corporation
Counsel of the City of Troy

                    **Defendants.**

_____

The Plaintiff, as and for a Complaint, alleges as follows:

## PARTIES

1.      Plaintiff, David Mulinio ("Mulinio") is an individual residing in the
County of Rensselaer, State of New York.

2.      Mulinio is duly registered to do business as Lawn-Pro, a landscaping
business he operates throughout the Capital District of New York.

3.      Defendant, City of Troy, is a municipal corporation located in
Rensselaer County duly organized pursuant to the laws of the State of New
York.

4.      Defendant, Harry Tutunjian, is the duly elected Mayor of the City of
Troy and is a resident of Rensselaer County.

5.      Defendant, David B. Mitchell, served as the duly appointed Corporation
Counsel of the City of Troy during the events described in this Complaint.

## JURISDICTION

6.     This action is brought pursuant to 42 U.S.C. §1983.

7.     This Court has original jurisdiction of all civil actions arising under the Constitution of the United States pursuant to 28 U.S.C. §1331.

8.     This Court has original jurisdiction of civil actions to secure equitable or other relief under any Act of Congress providing for the protection of Civil Rights pursuant to 28 U.S.C. §1343.

9.     This Court has supplemental jurisdiction over the claims arising in this action that form the same case or controversy as the plaintiffs' claims arising under the Constitution of the United States and acts arising under an Act of Congress providing for the protection of Civil Rights pursuant to 28 U.S.C. §1367.

## VENUE

10.     This lawsuit arises out of a pattern and practice of actions occurring in the City of Troy, Rensselaer County, New York.

11.     Upon information and belief, all individual plaintiffs and defendants in this action are residents of a County within the Northern District of New York.

12.     Venue is proper in the United States District Court, Northern District of New York.

## DEMAND FOR A JURY TRIAL

13.     Plaintiff demands a jury trial on all causes of action that may properly be determined by a trial by jury.

## FACTUAL BACKGROUND

14.    David Mulinio began a snow removal business in or about 1999 by purchasing a number of existing contracts.

15.    The snow removal business grew since Mulinio first bought it such that by 2007 he serviced, directly or through subcontractors, approximately ninety commercial snow removal contracts.

16.    In or about 2000, Mulinio purchased a landscaping business consisting of a single truck, trailer, two lawn mowers and some miscellaneous equipment.  Mulinio first did business as Pro-Mow, but began doing business as Lawn-Pro shortly after acquiring the enterprise.  Mulinio began operating both the landscaping and snow plowing businesses.

17.    As of 2007, Mulinio had between ten and fifteen employees working for him at any given time during landscaping season.

18.    Defendant Harry Tutunjian ("Mayor") was first elected Mayor of the City of Troy in November of 2003.  Upon information and belief, bears animus toward Mulinio and has directed the City to commit illegal, improper, arbitrary and capricious acts toward Mulinio or has negligently supervised his Administration and allowed illegal, improper and arbitrary acts toward Mulinio to occur.

19.    Garages at 203-207 4th Street were sold at a tax sale by the City of Troy.

20.    Mulinio purchased the garages at 203-207 4th Street when he received an assignment of a bid from the high bidder at the tax auction for these properties.

21.    Upon information and belief, the purchase of these garages infuriated the Mayor and persons under the Mayor's supervision and control because Mulinio obtained these properties at a good price (for the purchaser).

22.    Mulinio stores snowplowing equipment in the garages he owns at 203-207 4th Street in the City of Troy.

23.    After purchasing the garages, Mulinio's snowplow operators and other crew members congregated at the garages and received their work assignments to perform snow removal services during snowstorms.

24.    Upon information and belief, the Mayor and members of his administration did not believe Mulinio could lawfully operate a snowplow business in that manner at 203-207 4th Street.

25.    Upon information and belief, the Mayor directed the Public Works Department of the City of Troy to block off both sides of the alley from which Mulinio's trucks enter and exit the City streets during an active snowstorm to prevent Mulinio from conducting his snowplowing business and to cause him economic duress.

26.    Upon information and belief, the day after blocking the alleys during the snowstorm, the Mayor directed his staff to place barricades in front of Mulinio's garage so that Mulinio's snow removal equipment could not leave the garages in which they were stored.

27.    The use of physical barricades to attempt to cripple and close Mulinio's snowplow business was the first instance of what became a pattern and practice of using arbitrary, capricious, illegal and unlawful means of using code enforcement against Mulinio.

### THE POLICY OF USING CODE ENFORCEMENT TO PUNISH PERSONS PERCEIVED TO BE OPPONENTS OF THE TUTUNJIAN ADMINISTRATION THROUGH SELECTIVE ENFORCEMENT

28.    Upon information and belief, the Mayor maintains a policy of using code enforcement to punish, retaliate against, harass and annoy persons perceived to be opponents of the Mayor's administration.

29.   During the past decade, Mulinio was also in the business of buying rental properties in the City of Troy, repairing and rehabilitating those buildings and selling the properties at a profit.

30.   This real estate business was a joint venture with his partner, Frank Lanni ("Lanni").

31.   The properties in which Mulinio had an ownership interest were sometimes owned in his name, sometimes in the name of his partner, Frank Lanni, and sometimes in the name of the company "Tri-City Homes".

32.   Properties owned by Mulinio, Lanni and Tri-City Homes were scattered throughout the City of Troy.

33.   The Mayor and key members of his administration were aware that Mulinio's real estate business included homes in which the deeds were in the name of Mulinio, Lanni and Tri-City Homes.

34.   On at least one occasion the Mayor and his administration conducted sweeps targeted at homes Mulinio had a property interest in and cited properties owned by Mulinio, Lanni and Tri-City Homes for code violations because of Mulinio's ownership interest in the properties.

35.   The Mayor and his administration also utilized selective code enforcement to punish and harrass Mulinio after Mulinio purchased property on Ford Avenue in the City of Troy.

36.   After Mulinio signed a contract for the purchase of the Ford Avenue house but before closing on the house and the transfer of title, there was a serious collapse of a portion of the foundation wall in the basement.

37.   Upon learning of the collapse, Mulinio consulted with the Troy City Engineer to determine whether the house could be repaired so that it was structurally sound and would meet applicable building code requirements.

38.    The City Engineer and Mulinio agreed that the house was not in imminent danger of collapse, could be repaired and met applicable building code requirements if an agreed upon repair plan was implemented.

39.    Upon receiving these assurances from the City Engineer that the house was not in imminent danger of collapse and that the City would consider the structure to meet applicable building code requirements upon the implementation of an agreed upon repair plan, Mulinio performed pursuant to the contract and purchased the Ford Avenue home.

40.    Within twenty-four hours of Mulinio's purchase of the Ford Avenue home, the property was cited as unfit for human habitation and scheduled to be demolished in five days time.

41.    The demolition citation was issued even though the City Engineer and Mulinio had already determined the structure was not in imminent danger of collapse and could be rehabilitated through the agreed upon repair plan.

42.    Upon information and belief, the City did not cite the Ford property for demolition during the weeks between the collapse and the transfer of title to Mulinio and instead waited until Mulinio owned the property before issuing the citation at the direction of the Mayor for the purpose of causing Mulinio economic harm.

43.    Upon information and belief, the selective use of code enforcement as a tool to retaliate against and punish persons who are critical of the Tutunjian administration or who are perceived to be opponents of the Tutunjian administration is a policy and practice established by and supported by Mayor Tutunjian.  The policy is not limited to actions taken against Mulinio.

44.    Upon information and belief, in March of 2007, a Rensselaer County employee executed an affidavit describing how key members of Mayor Tutunjian's adminstration, Deputy Mayor Daniel Crawley, Public Works Commissioner Robert Mirch and the Mayor's Spokesman, Jeff Buell, drove the employee to City Hall in a City-owned

vehicle and coerced her into making a recording in which she pretended she was a woman named "Tonya" and that she had been sexually harrassed by City Councilman William Dunne.

45.   Upon information and belief, the recording was sent from City Hall to a political consultant who then sent the taped message to voters in Councilman Dunne's district shortly before the November, 2005 election.

46.   Upon information and belief, when Troy resident Joseph DeSeve learned of the contents of the affidavit described above he sent an e-mail to Mayor Tutunjian, Deputy Mayor Crawley and Jeff Buell demanding the resignations of Crawley, Buell and Mirch, criticizing the Mayor for being complicit in the activity (or, in the alternative for his negligent supervision of these employees), and urging the defeat of the Mayor in the November, 2007 elections.

47.   Upon information and belief, three days after sending the e-mail, DeSeve was cited by the City of Troy for the presence of graffiti on the outside of a building he owned.

48.   Upon information and belief, the existence of graffiti on the outside of his building is not a violation of the Troy City code and not properly subject to citation and prosecution.

49.   Upon information and belief, no other buildings in the vicinity of the building owned by DeSeve with graffiti on the outside were cited for this alleged violation of City code at the time DeSeve's property was cited.

50.   Upon information and belief, another instance of selective use of code enforcement to punish perceived opponents of the Tutunjian administration or to retaliate against those individuals occurred in September of 2006.

51.   On September 6, 2006, the City of Troy acted unilaterally and without the opportunity for comment or hearing to revoke the certificate of occupancy the City previously issued allowing Blakeborough to operate a bar at property he owned on 351

Fourth Street.

52.   Blakeborough retained counsel to represent him in his dispute with the City because he had invested his life savings in the acquisition and rehabilitation of the building so it could be operated as a bar and the City revoked his certificate of occupancy without due process of law shortly before it was to open.

53.   Blakeborough believed the City had unilaterally rescinded his certificate of occupancy without notice or an opportunity to be heard in retaliation for Blakeborough allowing a faction of the Rensselaer County Working Families Party to meet in his building at 351 Fourth Street.

54.   Counsel for Blakeborough wrote Coporation Counsel Mitchell about the unilateral revocation of the certificate of occupancy, cited a judicial precedent with similar facts holding that a unilateral revocation of a certificate of occupancy without notice or an opportunity to be heard was a violation of a citizen's right to procedural due process of law and Blakeborough's belief that the revocation was a prohibited retaliatory action.  The letter urged a resolution of the dispute without litigation.

55.   Within days of the receipt of the letter by Mitchell, Blakeborough and other family members throughout the City with the distinctive surname 'Blakeborough' were cited for various code violations in retaliation for the content of the letter to Mitchell.

56.   Upon information and belief, the retaliatory code violations issued to members of the Blakeborough family in September of 2006 were pursuant to the Mayor's policy of selective use of code enforcement to punish perceived enemies.

### MULINIO'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED WHEN THE DEFENDANTS REFUSED TO AWARD A CONTRACT FOR LANDSCAPING SERVICES TO HIM AND INSTEAD AWARDED THE CONTRACT TO THE SECOND LOWEST BIDDER

57.   On July 13, 2007, the City of Troy solicited sealed bids to perform landscaping services for the Troy-Menands Bridge Gateway Improvement Project ("Project").

58.   All potential bidders were instructed to submit sealed proposals to complete the Project on or before August 23, 2007 at 11:00 a.m..

59.   Mulinio submitted a proposal to perform the landscaping services set forth in the contract documents for the Troy-Menands Bridge Gateway Improvement Project for a price of $60,000.00.

60.   The Mulinio proposal was determined by the Bureau of Contracts and Procurement to be the lowest responsible bid for the Project.

61.   After opening the low bid, the City, through its Engineer, negotiated a proposed change to the bid and contract in which Mulinio would perform a reduced scope of services for a total contract price of $54,900.00.

62.   The City of Troy, through its Bureau of Contracts and Procurement, awarded Mulinio the contract in the amount of $54,900.00 on August 30, 2007.

63.   At all times Mulinio complied with the bidding requirements and conditions of the City of Troy for the Project.

64.   Upon information and belief, subsequent to the award of the contract on August 30, 2007, Mayor Tutunjian, and Corporation Counsel David Mitchell determined the City would not award the Project to Mulinio.

65.   Upon information and belief, the determination of the Mayor and Corporation Counsel to revoke the contract with Mulinio was arbitrary, capricious and unlawful.  The wrongful and unlawful determination deprived Mulinio of his right to Due Process of Law.

66.   After informing Mulinio that he would not be provided with an executed contract in the amount of his lowest bid, the Mayor unilaterally granted the contract to the second lowest bidder.

## AS AND FOR A FIRST CAUSE OF ACTION
## DENIAL OF EQUAL PROTECTION OF LAW

67.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "66" above as though fully set forth herein at length.

68.   Defendants violated the plaintiff's right to equal protection of law because it selectively enforced the City's zoning code.

69.   Mulinio was treated differently from other property owners in the City of Troy.

70.   The differential treatment between Mulinio and other property owners was due to Tutunjian and Mitchell's malicious and bad faith intent to cause economic injury to Mulinio.

71.   Mulinio suffered nominal monetary damages as a result of the defendants' violation of his Due Process right to equal protection of law.

## AS AND FOR A SECOND CAUSE OF ACTION

## VIOLATION OF MULINIO'S RIGHT TO SUBSTANTIVE DUE PROCESS OF LAW

72.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "71" above as though fully set forth herein at length.

73.   Mulinio was harmed by the refusal of the City to award the contract to perform services required in the Project even though he was the lowest bidder for the job.

74.   Mayor Tutunjian acted under color of State Law when he determined that Mulinio would not be awarded the contract for the Project even though he was the lowest bidder.

75.   Corporation Counsel Mitchell acted under color of State Law when he determined that Mulinio would not be awarded the contract for the Project even though he was the lowest bidder.

76.   The refusal to award a contract to Mulinio when he was the successful qualified low bidder and when the laws of the City of Troy and the State of New York required the contract to be awarded to Mulinio violated his right to substantive due process of law and his right to equal protection pursuant to the United States and New York State Constitutions.

### AS AND FOR A THIRD CAUSE OF ACTION PURSUANT TO 42 U.S.C. '1988

77. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "76" above as though fully set forth herein at length.

78. The Plaintiff is entitled to the reasonable attorneys fees incurred in enforcing 42 U.S.C. '1983.

### AS AND FOR A FOURTH CAUSE OF ACTION FOR PUNITIVE DAMAGES

79. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "78" above as though fully set forth herein at length.

80.   The defendants conduct toward Mulinio was intentional and malicious.

81.   The defendants conduct toward Mulinio was wanton and reckless.

82.   The Plaintiff is entitled to punitive damages.

WHEREFORE, the plaintiff demands a money judgment in the amount of $54,900.00, an Order enjoining the City of Troy, Mayor Tutunjian from selectively using

code enforcement in a manner designed to infringe upon the equal protection rights of persons living and working in the City of Troy punitive damages in an amount to be determined by the Court together with such other and further relief as the Court deems just and proper.

Dated: September 17, 2010

By:

\_\_\_/s *Joshua A. Sabo*\_\_\_\_\_
Joshua A. Sabo, Esq.
Bar Roll No. 508714
287 North Greenbush Road
Troy, New York 12180
(518) 286-9050
jsabo@sabolaw.net